1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                         CENTRAL DISTRICT OF CALIFORNIA
10
11   BRENDA HAGEMAN et al.,                Case No. 8:23-cv-01045-HDV-KES
12
13                Plaintiffs,              **ORDER DENYING DEFENDANT'S
                                           MOTION TO COMPEL ARBITRATION**
14                                         **[DKT. NO. 37]**
15        v.
16
17   HYUNDAI MOTOR AMERICA,
18
19                Defendant.
20
21
22
23
24
25
26
27
28

1

I.   **INTRODUCTION**

This putative class action involves allegedly defective tow hitch wiring in Hyundai's Palisade vehicles. Before the Court is Hyundai Motor America's ("Hyundai") Motion to Compel Arbitration (the "Motion") [Dkt. No.37]. Hyundai maintains that when Plaintiffs signed up for optional Bluelink services at a local dealership, they agreed to arbitration of all claims relating in any way to their vehicles.

The Motion presents three distinct legal questions. First, does the delegation clause in the parties' arbitration agreement require this Court to refer all questions—including that of arbitrability—to a third-party arbitrator? Second, is the arbitration agreement itself valid? And third, does the agreement by its terms cover the claims alleged here?

As to the initial foundational issue, the Court concludes that the delegation clause does ***not*** contain "clear and unmistakable" language sufficient to refer all questions to an arbitrator because the agreement expressly reserves class issues to the Court. On the second question of validity, the Court finds that the Hyundai arbitration agreement is a contract of adhesion—rife with both procedural and substantive unconscionability—that if interpreted as Hyundai cynically suggests would potentially cause enormous surprise and prejudice to its broader customer base.

Most importantly, on the substantive merits of the third question, Hyundai's interpretation of the arbitration agreement is patently absurd. Under no reasonable reading of the plain language of this agreement can Plaintiffs' product defect claims be covered under the arbitration provisions simply because the relatively minor Bluelink contract—a contract that offers "concierge services" and has nothing to do with the rest of the Hyundai Palisade—used the term "vehicle." To the contrary, accepting Hyundai's breathtakingly broad reading would contravene hundreds of years of contract interpretation principles going back to William Blackstone.[1] Hyundai's Motion is denied.

---

[1] In making this argument, Hyundai joins Disney and others in the rogues' gallery of corporate weaponization and abuse of the arbitration agreement. *See* Jessie Yeung & Jon Passantino, *Disney Reverses Course on Bid to Block Wrongful Death Lawsuit by Widower Who had Disney +,* CNN (Aug. 19, 2024), www.cnn.com/2024/08/19/ business/disney-arbitration-wrongful-death-lawsuit-intl-hnk/index.html.

## II. FACTUAL BACKGROUND

Hyundai sold Plaintiffs and putative class members 2020–2022 Hyundai Palisade vehicles with allegedly defective tow hitch wiring modules. First Amended Complaint ("FAC") ¶ 1 [Dkt. No. 19]. Plaintiffs and class members paid approximately $475–$750 for optional tow hitch and tow wiring harness module accessories to operate an attached trailer's turn signals and brake lights. *Id*. ¶ 2. As alleged in the FAC, the tow wiring harness modules contain defects causing them to short circuit and catch on fire. *Id*. ¶ 4.

Hyundai issued a recall on August 22, 2022 and admitted that "debris and moisture accumulation on the tow hitch harness module printed circuit board may cause an electrical short, which can result in a fire and that a fire while parked or driving can increase the risk of injury." *Id*. (cleaned up). After issuing the recall, Hyundai directed purchasers to return their vehicles to Hyundai for repairs. *Id*. ¶ 5. But the repairs only disabled the tow hitch wiring such that the turn and brake signals no longer worked. *Id*. As a result, many purchasers can no longer use their vehicles to tow.

Plaintiffs brought this action on June 14, 2023 and filed a First Amended Complaint on October 16, 2023. *See* Complaint [Dkt. No. 1]; FAC. Plaintiffs assert eleven claims against Hyundai for (1) unjust enrichment, (2) breach of implied warranty under New Jersey law, (3) breach of express warranty under New Jersey law, (4) breach of implied warranty under Pennsylvania law, (5) breach of express warranty under Pennsylvania law, (6) breach of express warranty under Utah law, (7) breach of express warranty under Minnesota law, (8) breach of express warranty under South Carolina law, (9) breach of implied warranty under New Hampshire law, (10) breach of express warranty under New Hampshire law, and (11) breach of express warranty under Arizona law. *See* FAC.

Hyundai filed a Motion to Dismiss on October 30, 2023 seeking dismissal of all claims. [Dkt. No. 22]. The unjust enrichment claim was stricken and the breach of express warranty claims were dismissed. [Dkt. No. 35]. The case was previously before District Judge Cormac J. Carney and was transferred to this Court on May 31, 2024.

On April 24, 2024, Hyundai filed its Motion to Compel Individual Arbitration. *See* Motion.

Hyundai asserts that Plaintiffs enrolled in Hyundai Bluelink Services,[2] a communication and technology feature in their cars, during a Dealer-Assisted enrollment process. *Id*. at 1. To enroll in the Bluelink services, Plaintiffs had to agree to a Connected Services Agreement ("CSA"). *Id*. Plaintiffs were required to click a box acknowledging that they have read and agree to the Bluelink Terms and Conditions, which included a hyperlink to the then effective Connected Services Agreement. Declaration of Vijay Rao ("Rao Decl.") Exhibit I. The terms and conditions of the CSA contained an arbitration provision, which states as follows:

> Hyundai and you agree to arbitrate any and all disputes and claims between us arising out of or relating to this Agreement, Connected Services, Connected Services Systems, Service Plans, your Vehicle, use of the sites, or products, services, or programs you purchase, enroll in or seek product/service support for, whether you are a Visitor or Customer, via the sites or through mobile application, except any disputes or claims which under governing law are not subject to arbitration, to the maximum extent permitted by applicable law. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law.

Rao Decl. Ex. E-F ¶ 15.C.(a), Ex. G-H ¶ 14.C.(a)). "Hyundai" is defined in the CSA to include "Hyundai Motor America." Rao Decl. Ex. E-H at p.1. "You" is defined as any person who "purchased, leased, [or subscribed] to a Vehicle equipped with … the Connected Services and/or has activated the Connected Services." *Id*.

The arbitration clause goes on to state that "You agree that, by entering into this Agreement, you and Hyundai are each waiving the right to a trial by jury or to participate in a class or representative action to the maximum extent permitted by law." Rao Decl. Ex. E-F ¶ 15.C.(a), G-H ¶ 14.C.(a). And "ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS TO THE MAXIMUM EXTENT PERMITTED BY LAW; CLASS ARBITRATIONS, CLASS ACTIONS OR REPRESENTATIVE ARBITRATIONS ARE NOT

---

[2] Hyundai describes Bluelink services as an optional connected services systems that has various features such as remote start, remote door lock, remote care finders, on demand diagnostics and alerts, enhanced roadside assistance, and emergency assistance. FAC at ¶ 4.

4

PERMITTED." *Id.* (all caps in original). The arbitration provision also contains a delegation clause which represents that:

> [a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement´s other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. However if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall decide whether this agreement permits class proceedings. For the avoidance of doubt, the court and arbitrator shall be bound by the terms of this Agreement, including with regard to the class and representative waiver provision.

*Id.* The parties did not submit with their Motion papers any of the standardized purchase contracts that customers typically sign when purchasing a Hyundai vehicle. At oral argument, counsel for Hyundai essentially conceded that such contracts do not normally contain an arbitration provision.

On August 1, 2024, the Court heard oral argument on the Motion. [Dkt. No. 50]. The Court then ordered supplemental briefing on the issue of unconscionability, which the parties filed simultaneously on September 10, 2024. [Dkt. Nos. 55, 56].

### III.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") "governs arbitration agreements in contracts evincing 'a transaction involving commerce.'" *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1201 (9th Cir. 2021) (quoting 9 U.S.C. § 2). It "declares 'a liberal federal policy favoring arbitration' and provides that such agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) and 9 U.S.C. § 2).

The FAA allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court … for an order directing that such arbitration proceed in the manner provided for in such agreement."

9 U.S.C. § 4.  A district court's role is "limited to 'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "If the answer to both questions is yes, then the FAA requires a court 'to enforce the arbitration agreement in accordance with its terms.'" *Id.* (quoting *Chiron Corp.*, 207 F.3d at 1130).  "In construing an arbitration agreement, courts must 'apply ordinary state-law principles that govern the formation of contracts.'" *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  "[A]mbiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Pursuant to Section 2 of the FAA, there are two types of challenges to arbitration agreements: "One type challenges specifically the validity of the agreement to arbitrate, and the other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2010)).  If a party challenges the validity of the arbitration agreement under Section 2, then the court "must consider the challenge before ordering compliance with that agreement." *Id*. at 71.

## IV.   DISCUSSION

### A.   Delegation Clause

The Supreme Court has explained that "[t]he delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent–A–Center*, 561 U.S. at 68.  Parties may agree to arbitrate the gateway question of arbitrability, as the principle of arbitration is a matter of contract law.  *Id*. at 69.  For an issue to be delegated, 'it must be shown by 'clear and unmistakable' evidence that the parties intended to delegate the issue to the arbitrator." *Ajamian v. CantorCO2e*, 203 Cal. App. 4th 771, 781, (2012); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (applying same standard).  Clear and unmistakable is a "heightened standard."

6

*Rent–A–Center*, 561 U.S. at 70 n. 1.

    Here, the CSA's arbitration provision contains a delegation clause, which states "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement. . . ." Rao Decl. Ex. E-F ¶ 15.C, G-H ¶ 14.C. Therefore, before determining whether the arbitration agreement itself is valid, the Court must first determine whether Plaintiffs agreed to delegate the gateway question of arbitrability to the arbitrator where, as here, the case is a putative class action.

    After reviewing the relevant language of the parties' agreement, the Court concludes that the CSA does ***not*** meet this heightened standard. Although Section 14.C. states that "all issues are for the arbitrator to decide", it goes on to say ***in the same section***, "[h]owever if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall decide whether this agreement permits class proceedings." *Id*. That is exactly the situation here. So which is it? Does an arbitrator or the Court decide if a Plaintiff in a putative class action must go to arbitration? Or does the Court first decide the question of whether the agreement permits class treatment (presumably including the question of class certification) and, if so, then leave the case to proceed as a class action in arbitration?[3] The language is the very opposite of "clear and unmistakable." To the contrary, it is convoluted at best and contradictory at worst.

    Moreover, the delegation language in the CSA is inconsistent with the severability clause in

---

[3] The Court can imagine many other possible interpretations and variations on how to attempt to reconcile these two clauses. What is clear is that Hyundai wants to have its cake and eat it too—*i.e.,* to require the arbitrator to decide (almost) everything but to create a huge carve-out benefitting Hyundai so that only a judge—and not an arbitrator—can allow a case to proceed as a class (presumably so that an appeal can be filed, if necessary). But that still leaves the initial question up in the air because it is unclear who decides if a ***class plaintiff*** must go to arbitration in the first instance? And if this Motion is granted and the case goes to an arbitrator, when exactly would the Court decide "whether this agreement permits class treatment"?

Section 16(E), which states that "[i]f any part of this Agreement is considered invalid *by a court* or arbitrator, the rest of it will remain enforceable." Rao Decl. Ex. E-F ¶ 16.E, G-H ¶ 15.E (emphasis added). These contradictory provisions are similar to those in *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884 (2008). In *Baker*, the California Court of Appeal refused to enforce a delegation clause that read "[a]ny disputes concerning the interpretation or enforceability of this arbitration agreement, including without limitation, its revocability or voidability for any cause . . . . shall be decided by the arbitrator." 159 Cal. App. 4th at 888–89. A severance provision in the same agreement maintained that severance was allowed if "any provision of this arbitration agreement shall be determined by the arbitrator *or by any court* to be unenforceable." *Id*. at 891 (emphasis added). The Court in *Baker* found that the arbitration agreement did not clearly and unmistakably reserve to the arbitrator the determination of whether the arbitration agreement was enforceable because one provision stated that these issues were to be decided by the arbitrator while a separate provision implied that a court could find it unenforceable. *See id*. at 893–94. Many other California courts have similarly held that, where (as here) arbitration agreements that include severability clauses imply a role for the court, gateway issues of arbitrability are not clearly and unmistakably referred solely to the arbitrator. *See, e.g., Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1444 (2012) ("[W]e conclude the inconsistency between the Agreement's delegation and severability provisions indicates the parties did not clearly and unmistakably delegate enforceability questions to the arbitrator."); *Parada v. Superior Court*, 176 Cal. App. 4th 1554, 1566 (2009) (cleaned up) ("Use of the term 'trier of fact of competent jurisdiction' instead of 'arbitration panel' or 'panel of three (3) arbitrators' suggests the trial court also may find a provision, including the arbitration provision, unenforceable. The arbitration provisions of the [relevant agreement], as the one in *Baker*, did not 'clearly and unmistakably' reserve to the arbitration panel the issue whether those arbitration provisions were unenforceable.").

In summary, Hyundai has not demonstrated clear and unmistakable language delegating the question of arbitrability to the arbitrator. The Court must therefore address these issues.

### B.     Unconscionability

"Federal law provides that arbitration agreements generally shall be valid, irrevocable, and

enforceable except when grounds exist at law or in equity for the revocation of any contract." *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1105 (9th Cir. 2003) (citations omitted). When evaluating the validity of an arbitration agreement, "federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago*, 514 U.S. at 944). Because unconscionability is a defense that applies to contracts, a court may refuse to enforce an unconscionable arbitration agreement. *See id.*

"Under California law, unconscionability has both procedural and substantive elements, and both elements must be present for a court to invalidate a contract on the ground of unconscionability." *Baker*, 159 Cal. App. 4th at 894. But both elements need not be present in the same degree, because "procedural unconscionability must be measured in a sliding scale with substantive unconscionability." *Parada*, 176 Cal. App. 4th at 1569–70. Therefore, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz v. Found. Health Psychcare Servs, Inc.*, 24 Cal. 4th 83, 114 (2000).

Applying this standard as discussed below, the Court concludes that the CSA's arbitration agreement—if read broadly to cover all mechanical issues relating to the vehicle, as Hyundai suggests—would be unconscionable and therefore unenforceable.

### 1. Procedural unconscionability

The California Supreme Court in *Armendariz* explained that procedural unconscionability focuses on oppression or surprise due to unequal bargaining power. *Armendariz*, 24 Cal. 4th at 114. "Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 245 (2014) (cleaned up).

The oppression element is generally satisfied when the contract is one of adhesion. *Cobarruviaz v. Maplebear, Inc.*, 143 F. Supp. 3d 930, 941 (N.D. Cal. 2015). A contract of adhesion "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining

9

strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Armendariz*, 24 Cal. 4th at 113 (quoting *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961)).[4]

Here, the CSA is undoubtedly a contract of adhesion. Plaintiffs were required to sign the CSA to access the Bluelink services presented to them by the Hyundai dealerships. Plaintiffs did not have any bargaining power when they signed, and the CSA was certainly not the subject of any negotiation. To the contrary, it was presented on a standardized form, drafted, and imposed by a party of superior bargaining strength that left Plaintiffs only with the option of adhering to it or rejecting it. Moreover, Plaintiffs did not have a right to opt-out of the CSA. *See Cobarruviaz*, 143 F. Supp. 3d at 941.

The finding that the CSA is an adhesion contract "heralds the beginning, not the end, of our inquiry into its enforceability." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1319 (2005). Procedural unconscionability also requires a determination of the factors of surprise and oppression. *Parada*, 176 Cal. App. 4th at 1571. The analysis on surprise involves the extent to which the "challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party." *Morris*, 128 Cal. App. 4th at 1321.

The arbitration provisions in the CSA were not hidden. They consist of 11 paragraphs under the large font heading of "Resolving Disputes." *See* Rao Decl. Ex. E-F ¶ 15, G-H ¶ 14. But it is unclear whether Plaintiffs were provided ample time to read and study the CSA. There are simply not enough facts in the parties' submissions regarding the "Dealer Assisted Process" used to sign the CSA. Without more, the Court must assume that a reasonable consumer had time and opportunity to

---

[4] In analyzing whether an arbitration provision is oppressive, courts look not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives. The oppression factor may be defeated if the complaining party had a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1320 (2005) (quoting *Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal. App. 3d 758, 772 (1989)). That cannot be shown here since the Hyundai telemetrics by all accounts only operates on the Bluelink platform.

read the relevant language; nothing to the contrary has been shown.

But surprise here comes in another form. While the arbitration terms themselves were not hidden, the counter-intuitive interpretation that Hyundai advances (that this arbitration agreement commits the consumer to arbitration involving all mechanical issues relating to the car) certainly was not explained or disclosed prior to the Bluelink onboarding process.[5] It is safe to assume that any reasonable consumer would be surprised (nay, shocked) to learn that a Bluelink services agreement was intended to shorten the statute of limitations and require binding arbitration of serious physical injuries (including wrongful death) so long as the tort involved the "vehicle."

If that is what Hyundai truly intended, it should have made that point crystal clear. To that end, California courts have consistently maintained that "where a contractual provision would defeat the strong expectation of the weaker party, it may also be necessary to call his attention to the language of the provision." *Parada*, 176 Cal. App. 4th at 1571 (quoting *Wheeler v. St. Joseph Hosp.*, 63 Cal. App. 3d 345, 359–360 (1976)). There is no evidence to indicate that Hyundai called attention to the broader scope that its reading of the arbitration provision requires.

In short, the Court concludes that the CSA contains a significant degree of procedural unconscionability.

### 2. Substantive unconscionability

"Substantive unconscionability centers on the terms of the agreement and whether those terms are so one-sided as to shock the conscience." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 (9th Cir. 2003) (quoting *Kinney v. United Healthcare Servs. Inc.*, 70 Cal. App. 4th 1322, 1330 (1999). Plaintiffs contend that various provisions in the CSA meet this test, including the shortened statute of limitations and the overbroad "vehicle" language. Supplemental brief to Opposition at 8–9 [Dkt. No. 55].

The Court agrees. Plaintiffs assert warranty claims under the laws of seven states. Each of

---

[5] In truth, the Court doubts that Hyundai's lawyers and executives themselves envisioned this broad reading when it was first drafted. Indeed, if that was the intent, why not include the language in the purchase contract rather than in an optional service agreement?

these states has adopted the UCC, and outside of South Carolina, each state provides statutes of limitation of *four years* for breach of warranty claims.[6] But the CSA provides that "except where prohibited by law, you are not allowed to bring any claim against Hyundai (or any other third party beneficiary) more than *one year* after the claim arises." *See* Rao Decl. Ex. E-F ¶ 15.B, G-H ¶ 14.B (emphasis added). Hyundai's interpretation of the Bluelink statute of limitation provision would therefore supersede the UCC, supersede California's Song Beverly Consumer Warranty Act as well as parallel laws of other states, and severely decrease the time in which consumers could bring warranty claims for literally anything relating to the vehicle—from defective engine parts to faulty brake systems to design defects in the transmission. This statute of limitation as proposed unquestionably shocks the conscience.

Moreover, the ***entire*** arbitration agreement is unconscionable if read broadly to cover the entire vehicle. As discussed above, by adding the two words "the vehicle" into the CSA, Hyundai purports to force consumers to arbitrate every conceivable claim. Reading the CSA in this way would eliminate a consumer's right to a jury trial for every possible ***tort*** claim against Hyundai, including multi-million-dollar personal injury claims. Again, it is difficult to imagine a more unconscionable result flowing from a relatively unknown and nondescript onboarding contract relating to concierge and emergency calling services.

And there can be no question that, in practice at least, the provision would be entirely one-sided since it is inconceivable that a Bluelink customer would invoke this arbitration clause over a serious mechanical issue unconnected to the Hyundai telemetrics module. The Ninth Circuit has frowned upon these one-way contracts. In *Ingle*, for example, the Ninth Circuit found that an arbitration provision in an employment contract was substantively unconscionable because the benefit of the arbitration agreement flowed effectively in one direction. *Ingle*, 328 F.3d at 1173–75.

---

[6] *See* N.J. Stat. Ann. § 12A:2-725(1) ("An action for breach of any contract for sale must be commenced within four years . . . ."); 13 Pa. Stat. and Cons. Stat. Ann. § 2725(a) (same); UT Code § 70A-2-725(1) (same); Minn. Stat. Ann. § 336.2-725(1) (same); N.H. Rev. Stat. Ann. § 382-A:2-725(1) (same); Ariz. Rev. Stat. Ann. § 47-2725(A) (same); *see also* S.C. Code Ann. § 15-3-530(1) ("an action upon a contract, obligation, or liability. . ." must be filed within three years.).

1  Although the arbitration agreement at issue subjected the employer and employee to the same terms,
2  the Court found that the possibility that Circuit City would initiate an action against one of its
3  employees was so remote as to render the provision unilateral in practice. *See id*. at 1174–75. The
4  same result must be said to apply here.

5        C.      **Scope of the Arbitration Agreement**

6  But even assuming, *arguendo*, that the arbitration provision is *not* unconscionable, Hyundai's
7  Motion should be denied as a straightforward matter of contract interpretation. The Court would
8  then have to examine the question of "whether the agreement encompasses the dispute at issue."
9  *Chiron Corp.*, 207 F.3d at 1130. The question would thus become: Does the Bluelink-related
10  arbitration agreement cover the Plaintiffs' warranty claims regarding the defective tow hitches? The
11  Court concludes that it does not.

12  Because arbitration agreements are governed by contract law, when "enforcing an agreement
13  to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the
14  contractual rights and expectations of the parties.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
15  559 U.S. 662, 682 (2010) (quoting *Volt v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468,
16  479 (1989)). In interpreting a contact, courts look to (a) the ordinary and popular meaning of the
17  terms; (b) give effect to surrounding provisions to avoid superfluity; (c) read the contract as a whole;
18  and (d) avoid an absurd or inequitable result. *See Schertzer v. Bank of America*, 109 F.4th 1200,
19  1208 (9th Cir. 2024) (citations omitted). "In cases of uncertainty . . . . the language of a contract
20  should be interpreted most strongly against the party who caused the uncertainty to exist." *Int'l Bhd.*
21  *of Teamsters, Local 396 v. NASA Servs.*, 957 F.3d 1038, 1046 (9th Cir. 2020) (quoting Cal. Civ.
22  Code § 1654).

23  One of the cornerstone principles of contract interpretation is the "absurd-results canon",
24  which requires courts to apply the plain language of the text unless doing so would lead to an
25  absurdity. *See Revitch*, 977 F.3d at 718–19 ("By contrast, we use the absurd-results canon to discern
26  the mutual intent of the parties based on their reasonable expectations at the time of contract.");
27  *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 902 (N.D. Cal. 2020) ("Under California
28  law, the mutual intent of the contracting parties must be ascertained from the written terms of the

1  contract alone unless it would lead to absurd results."); *see also* Cal. Civ. Code § 1638 ("The
2  language of a contract is to govern its interpretation, if the language is clear and explicit, and does
3  not involve an absurdity."). Indeed, this maxim has its roots in the English common law going back
4  hundreds of years. *See* Williams Blackstone, Commentaries on the Laws of England 70 (A. Strahan
5  and W. Woodfall, 12th ed., 1793) ("The doctrine of the law then is this: that precedents and rules
6  must be followed, unless flatly absurd or unjust . . . .").

7      For all the reasons discussed above, the Court concludes that Hyundai's proposed reading of
8  the arbitration clause would lead to precisely the type of absurdity that the law abhors. Doing so
9  would elevate form over substance far beyond the bounds of acceptable advocacy. And it would
10 render utterly farcical the foundational principle—already stretched in the context of arbitration
11 agreements—that contracts are to be interpreted to give effect to the mutual intentions of the parties.

12     Were this not enough, Hyundai's argument also fails under the whole-text canon. *See*
13 Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012)
14 (Under the "whole-text" canon of interpretation, if practicable, a text should be read in a manner that
15 gives meaning to every part, and "[c]ontext is a primary determinant of meaning."). Under this well-
16 known guide to contract interpretation, courts are tasked with considering the entirety of the
17 document—including its context—to determine its meaning. *See id.* Hyundai's interpretation of the
18 disputed language is entirely inconsistent with this hermeneutical principle because it turns a blind
19 eye to the extensive language indicating very clearly that the CSA is all about the "Connected
20 Services." To give just one example, the first three sentences of the CSA state:

21     Welcome to Hyundai Blue Link for your Hyundai vehicle, or Genesis Connected Services for
22     your Genesis vehicle (collectively "Connected Services"). You are choosing to enroll in a
23     Connected Services service plan ("Service Plan"). These Terms and Conditions are the
24     agreement between us *regarding our provision of Connected Services to you*.

25 *See* Rao Decl. Ex. E-H (emphasis added). Reading the CSA in context and in its entirety, everything
26 in the relevant language—from the titles, to the definitions, to the discussion of remedies—makes
27 clear to a customer that the contract is about (and is *only* about) the Bluelink services.

28     In short, the Court concludes that the arbitration provision in the CSA does not cover the

Plaintiffs' warranty claims in the present action.[7]

## V.     CONCLUSION

For the reasons discussed above, Hyundai's Motion to Compel Arbitration is denied.

Dated: December 10, 2024

                                         Hernán D. Vera
                                         United States District Judge

---

[7] The parties devote significant discussion to the question of whether the provisions in dispute can be severed. But that argument misses the point. Hyundai's motion is denied for two reasons—because the arbitration provision would be unconscionable if applied as Hyundai suggests, and because Plaintiffs' claims nonetheless fall outside the scope of the arbitration provision under a proper interpretation of the CSA. Severing all or a portion of the offending language is immaterial to this analysis.

15